IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Christopher Burton, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1152 C.D. 2020 |
| | : | Submitted: May 21, 2021 |
| RSVB Couriers (Workers' | : | |
| Compensation Appeal Board), | : | |
| | : | |
| Respondent | : | |


BEFORE:   HONORABLE MARY HANNAH LEAVITT, Judge[1]
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge


<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE WOJCIK                       FILED: April 13, 2022

          Christopher Burton (Claimant) petitions for review of the Orders of the Workers' Compensation Appeal Board (Board) affirming the Decisions of a workers' compensation judge (WCJ), which denied Claimant's Claim Petitions for compensation benefits, and granted the Termination Petition of RSVB Couriers (Employer) to terminate his workers' compensation benefits, pursuant to the provisions of the Workers' Compensation Act (Act).[2]  We affirm.

**I.**

---

    [1] This matter was assigned to the panel before January 3, 2022, when President Judge Emerita Leavitt became a senior judge on the Court.

    [2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4; 2501-2710.

On December 1, 2017, Claimant was involved in a motor vehicle accident in the course and scope of his employment as a delivery driver for Employer. Claimant went to the hospital, but he did not receive any work restrictions. On January 11, 2018, Employer issued a Notice of Compensation Denial (NCD), which stated that Claimant "was in a company truck on I[-]76 on his way to the Fed [E]x Terminal when a vehicle shot out in front of him causing him to swerve and swipe a guardrail" resulting in a "low back strain." Reproduced Record (R.R.) at 4a. The NCD also stated that benefits were denied at that time because the "insurance carrier is unable to determine compensability for the above alleged injury at this time" and that the "investigation is continuing." *Id.* at 5a. However, on March 6, 2018, Employer issued a Medical-Only Notice of Compensation Payable (NCP) acknowledging Claimant's work-related low back strain, but only providing "compensation for medical treatment (medical only, no loss of wages) will be paid subject to the [Act]," and that "[c]ompensation for medical treatment is payable from the date of injury." *Id.* at 7a.[3]

On July 12, 2018, Claimant was terminated from his employment with Employer based on his purported misuse of a company fuel card for personal use. R.R. at 242a-45a. That same day, Claimant filed two Claim Petitions for compensation benefits in which he alleged, *inter alia*, that he sustained a work-related injury on July 11, 2018, while lifting a heavy package on his work truck. *See* C.R. Docket Entries 2 and 31. Claimant described the injury as a "lower back injury" in the nature of a "strain or tear, trauma to the muscle." *Id.* Claimant also stated that

---

[3] On August 1, 2018, Employer filed an Amended Medical-Only NCP with respect to Claimant's December 1, 2017 work-related injury. *See* R.R. at 8a-9a. However, as noted by the WCJ in her Decisions, "Claimant never filed a [Claim] Petition with respect to the December 1, 2017 injury." Certified Record (C.R.) Docket Entries 5 and 37 at 3 n.1.

he "called Rob[ Rangnow (Rangnow), Employer's owner and his supervisor, at] 1:30 p.m. [on] 7-11-18"; that Rangnow "came to [the] work area 2 [hours] later (after he took his son to work)"; that they "agreed to light duty and help after [Claimant's] doctor visit starting on 7-12-18"; and that "[o]n 7-12-18 [at] 9:30[, Claimant] was told [that his] services [were] no longer needed." *Id.*

On August 7, 2018, Employer filed an NCD with respect to Claimant's July 12, 2018 Claim Petition. R.R. at 10a-11a. On August 23, 2018, Employer filed an Answer to the Claim Petition denying all of the material allegations raised therein. *Id.* at 18a-20a. On December 27, 2018, Employer filed a Termination Petition alleging, *inter alia*, that "[i]t has been medically determined that Claimant [had] fully recovered from his work-related injury" as of December 3, 2018. *Id.* at 22a. All of the petitions were consolidated for disposition by the WCJ, *see id.* at 16a, 26a, and hearings before the WCJ ensued.

In her Decisions disposing of the petitions, the WCJ summarized the relevant evidence introduced in the proceedings as follows. At an October 30, 2018 deposition, Claimant testified that on December 1, 2017, he worked for Employer as a delivery driver, which entailed arriving at the terminal each morning and loading the truck to make deliveries. R.R. at 45a. On that day, he was driving the truck to the terminal when a vehicle pulled out in front of him causing him to swerve and sideswipe a guardrail. *Id.* at 45a-46a. Claimant went to the emergency room of Presbyterian Hospital (Presbyterian) complaining of pain in his head from hitting his head on the windshield, pain in his lower back, and pain in his knee. *Id.* at 49a. He was released from the hospital with prescriptions for medication, and returned to light-duty work that day at Rangnow's request. *Id.* at 46a, 47a. He continued to work and did not receive additional medical treatment until he sought medical care

3

on July 12, 2018, for his alleged work-related injury of July 11, 2018. *Id.* at 52a, 53a.

On July 11, 2018, Claimant allegedly sustained a work-related injury when he lifted a small, but heavy, box too quickly. R.R. at 54a. He heard something pop in his back and could not straighten out his back. *Id.* Claimant called Rangnow, who begged Claimant to finish his shift. *Id.* Claimant called his cousin who helped him finish the day. *Id.* at 55a.

On July 12, 2018, Claimant sought treatment at the University of Pennsylvania Hospital (Penn). R.R. at 55a-56a. He complained of worsening back pain across his beltline, but the pain did not extend into his legs. *Id.* at 56a. The hospital gave Claimant a paper containing work restrictions. *Id.* at 56a-57a. In August of 2018, Claimant started seeing Dr. Lombardo and treating with a chiropractor three times a week. *Id.* at 59a. Claimant has not worked for Employer since July 11, 2018, but, at the time of hearing, he was working as a driver for Lyft four days a week, earning $300.00 to $350.00 per week. *Id.* at 64a-65a, 66a-67a, 68a.

At the WCJ's June 24, 2019 hearing, Claimant testified that he lifted packages weighing up to 180 pounds in his position with Employer. R.R. at 286a. After the December 1, 2017 accident, Claimant wanted to see a company physician because his back was "killing" him, and he asked for light duty or to have a helper assist him. *Id.* at 287a-88a. After the accident, Claimant sent Rangnow a text saying that Erie Insurance had contacted him, and Claimant told Erie that he was "all better." *Id.* at 288a. He explained that he sent the text because if he did not work, Rangnow would have to find someone else and Claimant would lose his job. *Id.* at 288a-89a. After the accident, Claimant hired one of his cousins to help him out and

4

Claimant paid his cousin half of his paycheck. *Id.* at 289a, 290a. Employer also removed heavy weight objects from Claimant's truck to lighten his load. *Id.* at 289a.

Claimant disputed Rangnow's testimony before the WCJ that he called Rangnow from the road on July 11, 2018, and asked Rangnow to bring out diesel exhaust fluid (DEF), stating that "[t]hat's a lie." R.R. at 290a. Claimant would buy DEF as needed and Rangnow reimbursed him. *Id.* His personal use of Employer's fuel card was known by Rangnow and Rangnow would take the amount that Claimant owed out of his bonus. *Id.* at 291a-92a.

After Employer fired Claimant, he worked for Lyft from August 2018, to April 2019. R.R. at 293a. He had to pay increased insurance, gas, and tolls, which decreased his Lyft earning to $300.00 to $350.00 per week. *Id.* at 294a-95a.

Claimant does not suffer from any residual problems with his head or knee from the December 1, 2017 accident, but he has continuing back pain and his right leg "vibrates" once in a while. R.R. at 296a. He continues to treat with Maurice Singer, D.O. (Singer), and takes Tramadol for his injury. *Id.* at 296a-97a.

After Claimant's work-related December 1, 2017 injury, he was seen in Presbyterian's emergency room and discharged without any work restrictions. R.R. at 307a-08a. He did not seek any other medical treatment for this work-related injury between December 1, 2017 and August of 2018, when he started seeing Singer. *Id.* at 308a.

Claimant also presented the testimony of Saleem Wilson (Wilson), a former employee of Employer, at the WCJ's June 24, 2019 hearing. Wilson testified that he worked for Employer between October of 2017 and July of 2018, as a delivery driver, and Rangnow was his supervisor and boss. R.R. at 315a, 316a. Each of Employer's trucks was assigned a fuel card, but sometimes the fuel card was

5

missing so Rangnow would allow him to call Claimant to meet him or Rangnow would give him a fuel card with the pin number on it. *Id.* at 316a. He would meet up with other drivers to fill up at gas stations at least three times per week. *Id.* at 318a.

Claimant also presented Singer's February 27, 2019 deposition testimony. Singer is a general practitioner with no board certifications. R.R. at 121a. On August 24, 2018, he began treating Claimant for his December 1, 2017 work-related injury. *Id.* at 122a. He took a history of Claimant's injury, with Claimant stating that he was "super dizzy" and had abdominal and back pain. *Id.* at 122a-23a. Upon examination, Claimant had severe pain of a 10 out-of-10 level in his dorsolumbar spine, with pain radiating into his extremities associated with numbness. *Id.* at 123a. Claimant also had severe pain of a 10 out-of-10 level in his cervical spine. *Id.* However, Claimant continued to work and did not seek additional medical treatment. *Id.*

Claimant also described the July 11, 2018 work-related injury in which he heard his back "pop" as he was lifting an item weighing 75 pounds. R.R. at 123a. Claimant told Singer that he was not able to return to work. *Id.* Claimant told Singer that he was terminated and began to work for Uber. *Id.*

Physical examination revealed that Claimant had a decreased range of motion in the cervical and the dorsolumbral spine, muscle spasm, and a positive straight leg test raising bilateral to 15 degrees. R.R. at 124a. Singer diagnosed Claimant as suffering from cervical strain and sprain; acute cervical myositis; dorsal strain and sprain; dorsal myositis; acute lumbosacral strain and sprain; lumbar myositis; lumbar radiculopathy; cerebral concussion; anxiety; and post-traumatic syndrome; however, Singer ruled out herniated nucleus pulposis. *Id.* Singer opined

6

that the cerebral concussion is related to the December 2017 injury, but the other diagnoses appear to be a result of the second injury. *Id.* He recommended a course of treatment including physical therapy and medication, and the physical therapy was performed at Singer's office. *Id.*

A February 8, 2019 magnetic resonance imaging (MRI) showed a bilateral intraforaminal disc bulge at L2-3 and L3-4, and a focal midline and left paramedian disc herniation with some impingement on the dural sac and the S1 nerve root. R.R. at 126a. These findings show an underlying pathology that was rendered symptomatic by the December 2017 and July 2018 work-related injuries. *Id.*

Singer last examined Claimant on February 8, 2019, which revealed that Claimant had continued reduced cervical and dorsolumbar range of motion, and tenderness to palpation in the paravertebral muscles with muscle spasm in straight leg raising. R.R. at 127a. Claimant also had pain in his right knee with a decreased range of motion. *Id.* Following 4 months of physical therapy, Claimant's pain level was reduced to a level of 8- or 9-out-of-10 from a 10-out-of-10. *Id.* Singer opined that Claimant could not return to his pre-injury job because it would exacerbate his condition, and that Claimant was not fully recovered from his work-related injury. *Id.* at 127a-28a. Singer also opined that Claimant's current employment with Uber or Lyft is appropriate because Claimant is only driving, and not delivering, lifting, carrying or moving. *Id.* at 128a.

Singer reviewed the records of Claimant's August 7, 2018 treatment at Philadelphia Health Action (PHA) a few weeks before his first examination by Singer. R.R. at 128a. Singer acknowledged that the PHA August 7, 2018 record mentions low back pain, but does not mention any mid back or neck pain, and does not mention any work restrictions. *Id.* at 129a. Over two weeks later, on August 24,

2018, Singer documented complaints of neck and mid back pain, and low back pain, all at a level of 10-out-of-10. *Id.*

Singer acknowledged that his opinion on causation is based on Claimant's history of the December 1, 2017 and July 11, 2018 work incidents. R.R. at 130a. Singer conceded that he had no independent source of information regarding what happened on those two dates. *Id.* He also conceded that he did not review the July 12, 2018 emergency room records. *Id.* at 131a. He did not know how many hours per day or how many days per week that Claimant works for his current employer, Lyft. *Id.* at 130a. He was not aware of any records indicating that Claimant was placed on light-duty restrictions between the December 1, 2017 and July 11, 2018 work incidents. *Id.* Singer issued Claimant's first work restrictions on September 21, 2018. *Id.* at 132a. He conceded that the December 1, 2017 emergency room records do not show that Claimant was issued any work restrictions. *Id.*

Employer presented Rangnow's testimony at the WCJ's April 22, 2019 hearing. Rangnow testified that he is Employer's president and owner, which provides FedEx ground deliveries. R.R. at 225a-26a. He hired Claimant as a driver in October of 2017, and Claimant worked Tuesday through Saturday. *Id.* at 227a. Claimant worked alone and was not permitted to use a helper because the helper would need to be on the payroll and covered by Rangnow's insurance. *Id.* at 229a-230a. Rangnow provides the trucks to his drivers as well as a fuel card, which is to be used solely for fuel. *Id.* at 230a-31a. Each driver is assigned a PIN so that all of his or her purchases can be directly tracked for security, and the card is to remain in the truck at all times. *Id.* at 231a-32a.

8

Rangnow stated that Claimant called him after his December 1, 2017 injury, and he understood that Claimant was treated for a sore back. R.R. at 233a. Claimant did not miss any time from work following that injury. *Id.* at 233a-34a. In January of 2018, Claimant sent Rangnow a text message stating that Employer's workers' compensation carrier had contacted him about his claim, but he was not interested in pursuing it because he was fully recovered from his injury. *Id.* at 234a-35a.[4] Between December 1, 2017, and July 12, 2018, Claimant did not complain to Rangnow about any low back pain, right knee pain, or hip, mid back, or neck pain, and Claimant kept working full duty throughout that period without restrictions or a helper and did not ask for a lighter workload or a helper. *Id.* at 236a, 237a-38a.

Rangnow stated that he first became aware of Claimant's alleged July 11, 2018 work-related injury about one month after Claimant's termination on July 12, 2018. R.R. at 238a-39a. Claimant never called him about a work-related injury on July 11, 2018; however, Claimant did call him that day for DEF. *Id.* at 239a. Rangnow met Claimant on his route that day with the DEF, and Claimant did not say that he was injured and did not appear to be injured. *Id.* at 240a. Claimant finished his route that day, and there was no one else with Claimant on that day. *Id.* at 240a-41a. Employer submitted Exhibit D-3, a copy of text messages between Claimant and Rangnow on July 11, 2018, and July 13, 2018, and there is no mention of any work-related injury. *Id.* at 241a-42a, 248a; *see also* C.R. Docket Entry 25.

---

[4] Employer submitted Exhibit D-2, a copy of the text that Claimant sent, which reads, in relevant part:

> Hey [R]ob[.] Erie [I]nsurance keep[s] calling and texting [a]bout workers['] comp. I'm not interested or injured[.] I'm just stating facts so we can be on the same page. I recovered[.] [I']m fine!!!

R.R. at 386a. Exhibit D-2 was admitted into evidence without objection. *Id.* at 235a.

9

On the morning of July 12, 2018, Rangnow terminated Claimant's employment because there was an issue with Claimant's personal charges associated with his PIN on the fuel card. R.R. at 242a-44a. Claimant's work truck used diesel fuel, but the charges associated with his PIN number were for unleaded gasoline, and were purchased about 20 to 25 miles away from Employer's depot and in the opposite direction from Claimant's delivery area. *Id.* When Rangnow terminated Claimant and explained that it was based on the fuel charges, Claimant did not dispute it and left without an issue. *Id.* at 245a. Claimant also did not tell Rangnow that he was injured the day before. *Id.*

On July 13, 2018, Claimant texted Rangnow asking for a letter of termination so Claimant could get medical insurance for his family. R.R. at 246a-47a; *see also* C.R. Docket Entry 25. Claimant did not tell Rangnow that he was injured on July 11, 2018, in those text messages. R.R. at 246a-47a, 248a; *see also* C.R. Docket Entry 25.[5]

Employer also presented the April 16, 2019 deposition testimony of Ira Sachs, D.O. (Sachs). Sachs is a board-certified orthopedic surgeon who evaluated Claimant on December 3, 2018. R.R. at 146a-47a, 149a. Claimant presented with complaints of low back and right knee pain that he associated with a December 1, 2017 vehicle accident. *Id.* at 149a-50a. Claimant also reported a July 11, 2018 incident where he developed a sudden increase in low back pain while lifting a package at work. *Id.* at 150a-51a. Claimant did not complain of neck pain, mid back pain, pain extending into his lower legs stemming from his back, or post-concussion symptoms such as headaches. *Id.* at 154a.

---

[5] Employer's Exhibit D-3, a copy of the text messages between Claimant and Rangnow, was admitted into evidence without objection. R.R. at 248a.

Sachs testified that records of Claimant's treatment at Presbyterian on December 1, 2017, discuss a diagnosis of "chest pain, abrasion of the head, low back strain and unspecified injury to the abdomen and thorax." R.R. at 155a. The records do not mention any neck pain or right knee pain, and they do not provide any work restrictions. *Id.* at 156a-57a.

Sachs stated that records of Claimant's treatment at Penn on July 12, 2018, indicate that Claimant recounted a history of sharp left low back pain from lifting a box on July 11, 2018, and chronic back pain since a motor vehicle accident the preceding year. R.R. at 157a. On examination, there was mild left low back tenderness, but no other abnormalities were noted, and they do not provide any work restrictions. *Id.* at 157a-58a; C.R. Docket Entry 28 at 18.

Sachs testified that the February 8, 2019 lumbar spine MRI showed a midline left paramedian disc protrusion at L5-S1, with shallow bulging at L2-3 and L3-4. R.R. at 160a-61a. His review of the scans showed no evidence of cord or nerve root impingement, thereby ruling out a diagnosis of radiculopathy or disc syndrome, and no evidence of trauma-related changes. *Id.* at 161a-62a. The MRI showed multi-level degenerative changes. *Id.* at 162a.

On examination, Sachs noted that Claimant had excellent motor strength; no sciatic list or shift to suggest spasm; no sciatic notch tenderness to suggest radiculopathy; and no sacroiliac tenderness or spasm. R.R. at 163a. Neurological examination of the lower extremities was normal; there was no evidence of atrophy or wasting; and there was no evidence of sensory or reflex abnormality that would indicate neurologic post-traumatic injury. *Id.* at 163a-65a. Testing of Claimant's right knee was normal. *Id.* He found no objective evidence of any ongoing injury. *Id.* at 166a.

11

Based on the examination, history, and review of Claimant's records, Sachs opined that Claimant sustained a lumbosacral strain and sprain as a result of the December 1, 2017 and July 11, 2018 incidents, from which he had fully recovered as of December 3, 2018. R.R. at 167a-68a, 170a. There was no objective evidence upon examination and review of the MRI scan to substantiate Claimant's ongoing complaints. *Id.* at 169a.

The WCJ made the following credibility determinations with respect to the foregoing evidence:

> 11. Having observed Claimant's comportment and demeanor during testimony at the hearing, and having reviewed the evidence of record in its entirety, this [WCJ] finds Claimant's testimony to be less than credible. Claimant submitted no evidence to support his testimony that after the December 1, 2017 injury, he had a lighter workload or had his cousin help him with his deliveries. Further, his testimony is not consistent with the credible testimony of []Rangnow and the text message that he sent to []Rangnow indicating that he was recovered from the December 1, 2017 injury and did not want to respond to the insurance company. His testimony regarding the alleged July 11, 2018 injury is not consistent with the medical records and []Rangnow's testimony that Claimant never mentioned the injury.

> 12. Having observed []Rangnow's comportment and demeanor during testimony, and having reviewed the evidence of record in its entirety, this [WCJ] finds []Rangnow's testimony to be credible. []Rangnow's testimony is supported by the text messages he discussed and submitted.

> 13. Having observed []Wilson's comportment and demeanor during testimony, and having reviewed the evidence of record in its entirety, this [WCJ] finds []Wilson's testimony to be less than credible where it is inconsistent with the credible testimony of []Rangnow.

12

14. This [WCJ] finds the testimony of []Sachs to be more credible and persuasive than []Singer for the following reasons:

a. []Sachs is a board-certified orthopedic surgeon whereas []Singer is a general practitioner with no board certifications.

b. []Singer's opinions are based on the history provided by Claimant, who this [WCJ] has found not credible.

c. []Singer's testimony regarding his initial examination findings of 10 [out-]of[-]10 pain in Claimant's cervical and dorsolumbar spine is not consistent with contemporaneous medical records of PHA indicating no mention of mid to low back pain.

d. []Sachs' testimony is consistent with the objective medical evidence of record. He reviewed the films of the lumbar MRI and reasonably explained bases for his opinions.

e. []Sachs' opinion is consistent with Claimant's admission that after treating at the emergency room on December 1, 2017, he did not seek treatment for the December 1, 2017 injury until he saw []Singer in August of 2018.

C.R. Docket Entries 5 and 37 at 9-10.

Based on the foregoing credible evidence, the WCJ found that "Claimant failed to meet his burden of proving by competent and credible medical evidence that he sustained a work injury on July 11, 2018," and that "Claimant failed to meet his burden of proving that he sustained a disabling injury on December 1, 2017." C.R. Docket Entries 5 and 37 at 10. As a result, the WCJ concluded that Claimant did not sustain his burden of proving by competent and credible evidence that he sustained a disabling work-related injury on December 1, 2017, or that he

13

sustained a work-related injury on July 18, 2018. *Id.* at 11. The WCJ also concluded that Employer sustained its burden of proving that Claimant was fully recovered from his work-related injury as of December 3, 2018. *Id.* Accordingly, the WCJ issued orders denying Claimant's Claim Petitions and granting Employer's Termination Petition. *Id.* at 12. Claimant appealed the WCJ's Decisions to the Board, which affirmed the WCJ's order by Opinions and Orders dated October 26, 2020. *See* C.R. Docket Entries 8 and 40. Claimant then filed the instant petition for review of the Board's Orders.[6]

## II.

On appeal, Claimant argues that the Board's Opinions and Orders affirming the WCJ's Decisions are not "proper" because

> [t]he [Board] improperly failed to exercise its appellate function, as the WCJ's Decision[s] w[ere] not supported by substantial evidence, w[ere] arbitrary and capricious verging on bias, and w[ere] erroneous as a matter of law, as [they] ignored significant evidence establishing [the] occurrence of a traumatic motor vehicle accident during the course of [Claimant]'s work for [Employer] on December 1, 2017, subsequently aggravated by work[-]related occupational trauma to [Claimant]'s back culminating on July 11, 2018. The [D]ecision[s] should also be remanded because the [Board] erroneously and inaccurately misstated the WCJ's Decision[s].

---

[6] "'Generally, agency-level decisions–such as those of the WCJ and [the Board] here–are to be affirmed on appeal so long as the essential findings are supported by substantial evidence and there has been no constitutional violation, procedural irregularity, or error of law.' We defer to the factual findings of the WCJ, who, in the workers' compensation context, is the 'ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight.'" *Department of Labor and Industry v. Workers' Compensation Appeal Board (Lin and Eastern Taste)*, 187 A.3d 914, 922 (Pa. 2018) (citations omitted).

Brief for Petitioner at 5.[7]

**III.**

Preliminarily, we note that "[t]he Board is generally viewed as a 'body of appellate review,' evaluating the propriety of the WCJ's adjudication." *Gregory v. Workers' Compensation Appeal Board (Narvon Builders)*, 926 A.2d 564, 568 (Pa. Cmwlth. 2007) (citation omitted). On appeal from a WCJ's decision, the Board may only disregard the WCJ's findings of fact if: (1) there is not competent evidence to sustain the WCJ's necessary findings of fact, *Universal Cyclops Steel Corporation v. Workmen's Compensation Appeal Board (Krawczynski)*, 305 A.2d 757, 761 (Pa. Cmwlth. 1973); (2) the WCJ's findings of fact are insufficient, or the WCJ failed to make a finding of fact on a crucial issue necessary for the proper application of the Act, *L&S Tasta Pizza, Inc. v. Lundy*, 366 A.2d 592, 593 (Pa. Cmwlth. 1976); or (3) the WCJ's findings of fact are insufficient to enable the Board to determine why a claimant failed to sustain his burden of proof, *Armco, Inc. v. Workmen's*

---

[7] Pa. R.A.P. 2111(a)(4) provides that "[t]he brief of the appellant . . . shall consist of the following matters, separately and distinctly entitled and in the following order: . . . Statement of the questions involved." In turn, Pa. R.A.P. 2116(a) states, in relevant part:

> The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail. The statement will be deemed to include every subsidiary question fairly comprised therein. No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.

Accordingly, to the extent that Claimant raises issues in his appellate brief that are not "fairly suggested" by the quoted Statement of Questions Involved, they are waived for purposes of appeal. *See, e.g.*, *Mooney v. Greater New Castle Development Corp.*, 510 A.2d 344, 348 n.4 (Pa. 1986) ("The Superior Court refused to decide this question because it was not set forth in the statement of questions involved as required by Pa. R.A.P. 2116; and therefore, it was not properly before that court. For this reason, we will not consider the question.").

15

*Compensation Appeal Board (Carrodus)*, 590 A.2d 827, 831 (Pa. Cmwlth. 1991). The Board exceeds its appellate authority by expanding the breadth of the WCJ's findings where that expansion is not supported by the record. *Department of Labor and Industry v. Workers' Compensation Appeal Board (Lin)*, 155 A.3d 103, 107-08 (Pa. Cmwlth. 2017), *aff'd*, 187 A.3d 914 (Pa. 2018).

Additionally, to sustain an award of benefits, a claimant has the burden to establish that he "suffered a work-related injury and that this injury resulted in" disability. *Ruhl v. Workmen's Compensation Appeal Board (Mac-It Parts, Inc.)*, 611 A.2d 327, 329 (Pa. Cmwlth. 1992). Where an employer has issued a medical-only NCP, the burden is on a claimant seeking wage loss benefits to prove that the injury has resolved into a "disability" causing a loss of earning power. *Orenich v. Workers' Compensation Appeal Board (Geisinger Wyoming Valley Medical Center)*, 863 A.2d 165, 170 (Pa. Cmwlth. 2004). During the pendency of the claim petition, the claimant must demonstrate "that the injury continues to cause disability." *Ohm v. Workers' Compensation Appeal Board (Caloric Corporation)*, 663 A.2d 883, 886 (Pa. Cmwlth. 1995). An employer has no obligation to present any evidence during a claim petition proceeding. *Coyne v. Workers' Compensation Appeal Board (Villanova University)*, 942 A.2d 939, 954 (Pa. Cmwlth. 2008).

Moreover, "[t]o succeed in a termination petition, the employer bears the burden of proving that the claimant's disability has ceased and/or that any current disability is unrelated to the claimant's work injury." *Paul v. Workers' Compensation Appeal Board (Integrated Health Services)*, 950 A.2d 1101, 1104 (Pa. Cmwlth. 2008). An employer satisfies its burden of proof to show that a claimant is fully recovered when the employer provides unequivocal medical testimony "that it is [the medical expert's] opinion, within a reasonable degree of medical certainty,

16

that the claimant is fully recovered, can return to work without restrictions, and that there are no objective medical findings which either substantiate the claims of pain or connect them to the work injury." *Udvari v. Workmen's Compensation Appeal Board (USAir, Inc.)*, 705 A.2d 1290, 1293 (Pa. 1997).

As outlined above, in this matter, the WCJ specifically credited the testimony of Employer's medical expert, Sachs, to support her Decisions denying Claimant's Claim Petitions and granting Employer's Termination Petition. Sachs testified, in relevant part, as follows:

> Q. Doctor, after the history you obtained from [Claimant], your physical examination findings and your review of medical records, did you render an opinion as to the condition of [Claimant] as of when you examined him on December 3, 2018?
>
> A. Yes.
>
> Q. And what was your opinion?
>
> A. Resolved lumbosacral strain and sprain.
> And I qualify that by saying I didn't find any clinical evidence of lumbar strain and sprain or a disc abnormality and/or injury to the knee from either dates of injury, December 1[, 20]17[,] or July 11[, 20]18.
>
> Q. And that's true as of the date of your exam on December 3, 2018?
>
> A. Correct.
>
> Q. So you found no objective evidence of any injury at that point?
>
> A. I did not.
>
> Q. In terms of either injury date, does [Claimant] require any further medical care?

17

A.    No.

Q.    Does he require any restrictions of any kind as it pertains to his pre-injury job as a FedEx delivery man?

A.    No.

Q.    Doctor, how would you classify any right knee injury that [Claimant] may have sustained on December 1, 2017, as alleged?

A.    Well, I don't know the mechanism of injury. So the only thing I could testify to is, by the time I saw him, I found no evidence of any residual injury.

Q.    There was nothing to substantiate his ongoing complaints of non-specific pain to the right knee?

A.    Correct.

Q.    Doctor, you did review []Singer's narrative report. And he has a litany of what he claims are work-related diagnoses as they relate to both dates of injury.
      Do you agree or disagree with those diagnoses?

A.    Disagree.

Q.    And what's the basis for your opinion in that regard?

A.    So, again, there are subjective complaints, but I found no objective clinical evidence of residuals. And the MRI scan that I reviewed was kind of essentially benign, no cord or nerve root compression.
      And kind of the -- you know, you can't be claiming post-traumatic disc abnormalities and then go into the emergency room with no physical findings. So for all those reasons, I drew my conclusions.

Q.    Doctor, even assuming for the sake of argument that [Claimant] sustained some sort of an aggravation or exacerbation on July 11, 2018, of his lumbar spine injury of December 1, 2017, as of the date of your examination,

did you find any ongoing injury or condition of the lumbar spine in that regard?

A.     No.

Q.     Is there anything in the MRI study that would correlate or substantiate [Claimant's] subjective complaints in terms of when he presented to you on December 3, 2018?

A.     I found no evidence of that at the time of my clinical evaluation.

Q.     And, Doctor, you classified the December 1, 2017 injury to the lumbar spine as a strain and sprain?

A.     Yes.

Q.     And he achieved full recovery as of the date of your exam?

A.     In my view.

Q.     Doctor, have all of your opinions been expressed here today within a reasonable degree of medical certainty?

A.     Yes.

Q.     One last question, Doctor.   Did you find any evidence in the records that you reviewed of [Claimant being] placed under any formal work restrictions after either of these two incidents?

A.     No.

R.R. at 167a-71a.

In reviewing the foregoing testimony, this Court has explained:

Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion.   *Hoffmaster v. Workers' Compensation*

19

> *Appeal Board (Senco Products, Inc.)*, 721 A.2d 1152 (Pa. Cmwlth. 1998). In performing a substantial evidence analysis, this Court must view the evidence in a light most favorable to the party [that] prevailed before the factfinder. *Id.* Moreover, we are to draw all reasonable inferences which are deducible from the evidence in support of the factfinder's decision in favor of that prevailing party. *Id.* Furthermore, in a substantial evidence analysis where both parties present evidence, it does not matter that there is evidence in the record which supports a factual finding contrary to that made by the WCJ; rather, the pertinent inquiry is whether there is ***any*** evidence which supports the WCJ's factual finding. *Id.* It is solely for the WCJ, as the factfinder, to assess credibility and to resolve conflicts in the evidence. In addition, it is solely for the WCJ, as the factfinder, to determine what weight to give to any evidence. *Id.* As such, the WCJ may reject the testimony of any witness in whole or in part, even if that testimony is uncontradicted. *Id.*

*Sharkey v. Workers' Compensation Appeal Board (Federal Express)*, 786 A.2d 1035, 1038 (Pa. Cmwlth. 2001) (emphasis added).

Sachs' testimony, coupled with the corroborating testimony of Rangnow and the corroborating text messages between Claimant and Rangnow, provides competent substantial evidence to support the WCJ's Decisions in this matter. When viewed in a light most favorable to Employer, and drawing all reasonable inferences deducible therefrom, this evidence supports the WCJ's determination that Claimant failed to meet his burden of proving that he sustained an ongoing disabling work-related injury to support the award of workers' compensation benefits, and that Employer was entitled to the termination of Claimant's benefits as of December 3, 2018. It is of no moment that Claimant presented evidence that would support contrary conclusions, as it was solely for the WCJ to assess the credibility of the evidence that was presented and to accept it as credible, or reject it as not credible, even if it was uncontradicted. In short, we will

20

not accede to Claimant's request to review the WCJ's credibility determinations in this regard, and the Board did not abdicate its appellate function by refusing to accept Claimant's evidence over that offered by Employer as a basis to reverse the WCJ's Decisions.

## IV.

A review for capricious disregard of competent evidence is an appropriate component of appellate review in any case in which the question is properly raised before a court. *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 812 A.2d 478, 487 (Pa. 2002). A capricious disregard of evidence occurs where the "findings reflect a deliberate disregard of competent evidence that logically could not have been avoided in reaching the decision . . . ." *Pryor v. Workers' Compensation Appeal Board (Colin Service Systems)*, 923 A.2d 1197, 1205 (Pa. Cmwlth. 2007). Where substantial evidence supports the findings, and those findings support the conclusions, it should remain a rare instance where an appellate court disturbs an adjudication based on capricious disregard. *Wintermyer*, 812 A.2d at 487. As a result, capricious disregard of evidence occurs when the fact finder ignores relevant, competent evidence. *Williams v. Workers' Compensation Appeal Board (USX Corp.-Fairless Works)*, 862 A.2d 137, 145 (Pa. Cmwlth. 2004). However, capricious disregard does not exist when a WCJ has considered and rejected evidence. *Id.*

Contrary to Claimant's assertions, as outlined above, the WCJ considered and rejected Claimant's evidence regarding the severity of the injury resulting from the December 1, 2017 accident and that he sustained a work-related injury on July 11, 2018. This rejection of Claimant's evidence does not constitute a

21

capricious disregard of such evidence. *See, e.g.*, *Williams*, 862 A.2d at 145 ("[T]he WCJ did not deliberately ignore [the medical expert's] testimony–as evidenced by the WCJ's extensive summation thereof in [the f]inding [of fact], which includes a summation of [the expert's] testimony on direct and cross-examinations–but merely considered, and then rejected as not credible, said evidence. Such an express consideration and rejection, by definition, is not capricious disregard.").

As articulated above, the WCJ is the ultimate fact finder, and as such has complete authority over credibility determinations and the weighing of evidence. *Department of Labor and Industry*, 187 A.3d at 922. Where medical experts testify by deposition, a WCJ's resolution of conflicting evidence must be supported by more than a statement that one expert is deemed more credible than another. *Dorsey v. Workers' Compensation Appeal Board (Crossing Construction Co.)*, 893 A.2d 191, 194-95 (Pa. Cmwlth. 2006). "Some articulation of the actual objective basis for the credibility determination must be offered for the decision to be a 'reasoned' one which facilitates effective appellate review." *Id.* at 194-95 (quoting *Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 828 A.2d 1043, 1053 (Pa. 2003)). There are countless objective factors that may support a WCJ's credibility determinations, and such factors must be identified in the WCJ's decision. *Dorsey*, 893 A.2d 195.

Nevertheless, we have repeatedly stressed that Section 422(a) of the Act[8] does not permit a party to challenge or second-guess a WCJ's reasons for

---

[8] Section 422(a) of the Act states that

> [a]ll parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why

**(Footnote continued on next page…)**

credibility determinations. *Id.*; *Kasper v. Workers' Compensation Appeal Board (Perloff Brothers, Inc.)*, 769 A.2d 1243, 1244 (Pa. Cmwlth. 2001). In *Kasper*, we declined the claimant's "invitation to individually scrutinize each of the WCJ's reasons for his credibility determination." *Id.* We explained that

> [d]eciding credibility is the quintessential function of the fact-finder, particularly one who sees and hears the testimony. It is not an exact science, and the ultimate conclusion comprises far more than a tally sheet of its various components. We will not take the statutory mandate that a WCJ explain reasons for discrediting evidence as a license to undermine the exercise of this critical function by second guessing one or more of its constituent parts.

*Id.* (footnote omitted).

Moreover, where, as here, Claimant, Wilson, and Rangnow testified in person before the WCJ, the WCJ could base her credibility determinations upon her observation of these witnesses during the course of their testimony. As our Supreme Court has explained:

> [W]hen the issue involves the credibility of contradictory witnesses who have actually testified before the WCJ, it is appropriate for the [WCJ] to base his or her determination upon the demeanor of the witnesses. In such an instance, there often is not much to say, nor is there a need to say

---

and how a particular result was reached. The [WCJ] shall specify the evidence upon which the [WCJ] relies and state the reasons for accepting it in conformity with this section. When faced with conflicting evidence, the [WCJ] must adequately explain the reasons for rejecting or discrediting competent evidence. Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the [WCJ] must identify that evidence and explain adequately the reasons for its rejection. The adjudication shall provide the basis for meaningful appellate review.

77 P.S. §834.

much, in order for a reviewing body to determine that the decision was reasoned. Such a credibility determination may involve nothing more than the fact[]finder's on-the-spot, and oftentimes instinctive, determination that one witness is more credible than another. The basis for the conclusion that certain testimony has the "ring of truth," while other testimony does not, may be difficult or impossible to articulate-but that does not make such judgments invalid or unworthy of deference. To the contrary, people routinely undertake affairs of consequence based upon their judgment of the credibility and reliability of others, or their assessment of the mettle and character of the persons with whom they are dealing.

*Daniels*, 828 A.2d at 1052-53. In sum then, unless made arbitrarily or capriciously, a WCJ's credibility determinations will not be disturbed when the basis for such is present in the record on appeal. *Empire Steel Castings, Inc. v. Workers' Compensation Appeal Board (Cruceta)*, 749 A.2d 1021, 1027 (Pa. Cmwlth. 2000).

After careful review of the certified record in this matter, we conclude that the WCJ's credibility determinations are supported by ample substantial record evidence. Moreover, as outlined above, the WCJ extensively and exhaustively outlined the reasons for her credibility determinations, and, as a result, these determinations are not subject to our appellate review. Thus, we find the Board did not abdicate its appellate function or err by affirming the WCJ's Decisions in this regard.

## V.

Finally, the Board did not erroneously and inaccurately misstate the WCJ's Decisions. Claimant first asserts that the Board erred in determining that the WCJ did not commit error by failing to render credibility determinations regarding Claimant's consistent testimony at his unemployment compensation hearing that corroborates the evidence submitted in support of his Claim Petitions herein.

24

However, Claimant submitted the transcript of the unemployment compensation hearing solely for the limited purpose of rebutting Rangnow's testimony during the instant proceedings. Specifically, Claimant's counsel argued for the admission of the transcript as follows:

> [Counsel]: I would submit, Your Honor, that [Rangnow] certainly had the opportunity to have counsel present. It actually states that in the transcript. He voluntarily waived his right to counsel at that hearing. It is testimony given under oath and, therefore, I submit that it is admissible.
>
> [WCJ]: You are representing to me that there's evidence in here --
>
> [Counsel]: Discrepancies between the --
>
> [WCJ]: So it's rebuttal.
>
> [Counsel]: Rebuttal, correct.
>
> [WCJ]: I am going to admit it.
>
> [Counsel]: Thank you, Judge.

R.R. at 303a-04a.

Accordingly, in her Decisions, the WCJ stated that the unemployment compensation hearing transcript "was admitted solely for purposes of rebutting [Rangnow's] testimony." C.R. Docket Entries 5 and 37 at 9. The WCJ further found that "Rangnow's testimony at the unemployment compensation hearing was substantially similar to his testimony before this [WCJ]." *Id.* Thus, the Board did not improperly state that the WCJ did not err in failing to make credibility determinations with respect to Claimant's testimony at the unemployment compensation hearing because the transcript at that hearing was not admitted to

bolster Claimant's testimony in this matter, but solely to impeach Rangnow's testimony in these proceedings.

Claimant next submits that the Board misstated the WCJ's decision by indicating that the WCJ found Wilson's testimony not credible because it conflicted with Rangnow's testimony when, in fact, the WCJ found that Wilson's testimony was not credible based solely on his comportment and demeanor. However, as outlined above, in her Decisions, the WCJ based her credibility determination on both Wilson's comportment and demeanor and the inconsistency of Wilson's testimony with Rangnow's credible testimony. As the WCJ stated that, "[h]aving observed []Wilson's comportment and demeanor during testimony and having reviewed the evidence of record in its entirety, this [WCJ] finds []Wilson's testimony to be less than credible where it is inconsistent with the credible testimony of []Rangnow." C.R. Docket Entries 5 and 37 at 9-10.

Claimant also asserts that the Board misstated the WCJ's Decisions by excusing her failure to make necessary credibility determinations regarding non-live testimony, *i.e.*, testimony that he gave at the October 30, 2018 deposition and at the unemployment compensation hearing. However, as noted above, the transcript of the unemployment compensation hearing was admitted solely to rebut Rangnow's testimony in these proceedings so no credibility determination with respect to Claimant's testimony therein was required. Regarding Claimant's deposition testimony, again, the WCJ based her credibility determination both on his comportment and demeanor at the in-person hearing and its inconsistency with Rangnow's in-person testimony and the medical evidence. *See* C.R. Docket Entries 5 and 37 at 9. As a result, the Board did not misstate the WCJ's Decisions regarding her credibility determination of Claimant's in-person and deposition testimony.

26

Accordingly, the Board's Orders are affirmed.

_____

MICHAEL H. WOJCIK, Judge

27

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Christopher Burton, : 
  : 
                Petitioner : 
  : 
           v. : No. 1152 C.D. 2020
  : 
RSVB Couriers (Workers' : 
Compensation Appeal Board), : 
  : 
            Respondent : 

# **O R D E R**

AND NOW, this 13th day of April, 2022, the Orders of the Workers' Compensation Appeal Board dated October 26, 2020, are AFFIRMED.

_____

MICHAEL H. WOJCIK, Judge